Good morning. If it pleases the Court, Matthew G. Holt arguing on behalf of the petitioner, Miriam Garcia-Reyes. I would respectfully reserve two minutes for rebuttal. In this case, there were two underlying applications for relief that were denied, and I'll treat each application. As the Supreme Court decision in Holder v. Martinez, 2012, states, many provisions of immigration law advance the goals of promoting family unity and providing relief to aliens with strong ties to this country. Cancellation of removal for certain non-permanent residents under 1229B is such a provision. The relief provides an opportunity for adjustment of status in cases where, among other criteria, there is a finding of cumulative, exceptional, extremely unusual hardship to the U.S. citizen or lawfully permanent resident, children, spouses, or parents of the applicant for said relief. The issue here in this case, the respondent began living in the United States in 1988. She fled atrocious sexual, physical, and emotional abuse by her father and by her mother. She came to the United States. She raised two U.S. citizen children, a daughter named Daisy and a son named Jonathan, partly as a single mother. In 2010, she briefly left the United States to visit her father, who was dying, and within a week of her return to Mexico, her father died. She then returned to the United States, fearful of remaining in Mexico, and was provided with a credible fear interview, transferred by DHS to a detention center in Eloy, Arizona. From Arizona, she passed her credible fear. Her venue was changed to San Diego. She appeared for a hearing in June of 2011. That was her first hearing. She admitted the charges. She conceded removability and asked for the opportunity to apply for relief. The case was reset so she could apply for relief. She filed applications for cancellation of removal and also for asylum withholding and relief under the Convention Against Torture. She had to apply for that asylum, file the asylum application in court because at the time, you could only file the asylum application in court and not at the window. That was subsequently changed after that hearing. In October 2011, she timely and properly filed all her relief applications. The record was supplemented, biometrics were processed, fingerprints were taken, and the government filed its opposition to the applications for relief. In April of 2012, just two months before her eldest child Daisy's 21st birthday, she filed a motion to advance the hearing with a concern that she would become imminently ineligible for relief because her child would be turning 21. Considering that's a cumulative analysis of hardship, she wanted to have the hardship considered for both her son and her daughter. Her daughter was then living with her, was a new mother herself, had a history of mental illness, and was fully reliant on her mother. So Ms. Garcia wanted to have that consideration analyzed by the court. The judge took approximately one month to deny the motion to advance and held the hearing approximately eight days after Daisy's 21st birthday. But the hearing could have been before the hearing, but counsel deferred the hearing, right? The court provided two dates, June 7th and when there was a professional conflict on that date because of two other court hearings on the same date, she requested another date, which was June 20th. Once it was determined that there was a concern that Daisy would age out for purposes of analyzing her hardship, we immediately filed a motion to advance. We filed that motion to advance just two weeks after we received the Department of Homeland Security's opposition. You've only got ten minutes, and I've got to tell you, I don't think that's more serious of your two claims. And if you don't get to that, all you've done so far is tell us all the facts which we knew. So let's try to tell us why she should have humanitarian asylum. Yes, Your Honor. In this case, she was found credible with respect to the abuse that she suffered, and the Board of Immigration Appeals assumed in its decision that she suffered persecution and that it was on a protected ground. The Board of Immigration Appeals failed to consider whether or not she was eligible for humanitarian asylum. In its decision, it noted just very simply that she testified she was abused by her father. It didn't go into the fact that the abuse started from the age that she could remember how to think, which was later clarified as at age six or seven, she began to suffer this atrocious harm. And she suffered this atrocious harm all the way until she was 14 when she tried to escape her father. And when she tried to escape, he brought her back, pulling her hair back to the house. Then she was there again, and then by the time she turned 18, she fled to the United States, and she remained here up until he was on his deathbed. She went back one time after coming in 1918. All right, but her father is now dead. So why will she likely have a legitimate fear of future persecution that would get her humanitarian asylum? Well, in this case, I believe that if we can prove that the persecution she suffered was atrocious, then she would— What about the other part, about other serious harm? Other than the harm she suffered the first time, her father is dead, as Judge Gilman said. But why is she not eligible, or why is she eligible for other serious harm that she could suffer unrelated to the father? It doesn't have to be the same threat of harm as she suffered before if she establishes sufficient severity. So the other harm you're relying on is the fact that her family has been targeted, right? It's because there's a reasonable possibility that she may suffer other serious harm. And the other serious harm in this case was that her family was targeted, and in 2014, a matter of LEA was published by the Board of Immigration Appeals with respect to how the family should be analyzed in these family social group issues. So we believe—we would submit to the court that she suffered atrocious harm and therefore qualifies for humanitarian asylum. And because her family has been targeted multiple times and her family has suffered violence, that the other serious harm does rise to the level that she should be granted asylum. Well, I understand her brother-in-law was killed and her brothers had been shot at and all, but they were driving taxis. I mean, she's not going to drive a taxi. Why would she in particular have a reasonable fear of future harm? There were several arguments made as to her—the future harm consideration, but none of those were considered by the board and none of those were considered— they were not substantially considered by the board or by the immigration judge. We would submit to the court to remand the case for further fact-finding. Thank you, counsel. We wanted to save two minutes. Thank you. Good morning. Greg Pennington on behalf of the Attorney General. The court seems most concerned with the humanitarian asylum, so I'll jump right in there. As the board decided, they assumed past persecution, which is a prerequisite to even consideration of humanitarian asylum. They assumed all that. So then the next step would be for her to show either the unable or unwillingness to return arising out of the severity of the past harm, which I think Judge Gilman pointed out, the father's already dead, so her unwilling or unable to return based on the severity of the past harm isn't really a factor in this case. Also because she returned on her own volition and sent her own daughter to visit her father who abused her. So I don't think— Those relationships are very complicated. I can't say—I don't think you can say just because she went to visit her father before he died that she wasn't abused or that diminishes the severity of her abuse. I mean, her father was dying. But the question I have is were you in discussions to exercise prosecutorial discretion in this case? There were several requests made during the immigration proceeding that are in the record where her counsel submitted prosecutorial discretion requests to the trial attorney below. And then the case was also in mediation here. It was. And I think that was exhausted trying to determine whether DHS would join in a motion to reopen for consideration of an application for adjustment of status. Because as it stands now, she has a final order of removal. So she would have to have her proceeding reopened to have the immigration judge consider an application for adjustment of status. Okay. I read somewhere that she has an approved immigrant visa petition. That's correct. And she has filed a motion to reopen based on that visa petition. But the board denied it, I think, one, because there was no application attached to the motion to reopen as required by regulations, and also because she didn't show prima facie eligibility. And I attach those board decisions with the letter brief, I believe, or with the opposition to her motion to supplement the record. So she's already tried to move the board to reopen the proceeding based on that visa petition. I don't know if she's approached DHS to join in a motion to reopen, but I think that's what the mediation efforts were for. That was exhausted. I don't know what her eligibility for is. I think there was discussion in the record because when she came back from visiting her father, she presented a couple fraudulent documents to try to reenter the United States. So DHS charged her with misrepresentation to enter. That is its own problem because then she would require a waiver. And during the proceedings, she wasn't eligible for the waiver because you can only seek the waiver by showing hardship to a spouse or parent. And she didn't have a spouse or parent who is a United States citizen or lawful permanent resident. At that time, she didn't have it. So now she's married and has this new visa petition. It's possible now that she can seek that waiver, but I don't know if she didn't submit enough evidence to the board that they didn't want to reopen it at that point. But that's just kind of where the case is now as far as prosecutorial discretion. It's been sought. It's been in mediation. I don't know if more mediation would be fruitful at this point. So back to humanitarian asylum, the other one is the other serious harm. So, again, we have the assumption that there's past persecution. So if she could show a reasonable possibility of other serious harm. What is a reasonable possibility? Is that 10 percent possibility? I would agree with that because I think that's similar to the standard for asylum a well-founded fear is considered. You don't think there's a 10 percent possibility that she faces possibility of serious harm due to all of the circumstances of the family and the evidence in the record about the family? Well, the board didn't think that, and the court is reviewing that for an abuse of discretion. It seems pretty difficult to say there's not a 10 percent chance that she would suffer serious harm given the record of the harm to her family. Correct, Judge Reinhart. But the harm to her family happened in the state of Mexico, which is in far south Mexico, and she testified that she would go and live in Tijuana most likely to be close to the border so her children could come across and visit her. Did the board rely on that, the geographical location? I don't think so. No, you're right, Judge Reinhart. The board did not. The board said the respondent has many family members in Mexico who have not been harmed. Well, that seems kind of silly. The whole family has to be killed before you can show there's a 10 percent chance? I would think that would be untenable, but, again, I would just urge the court, reviewing for an abuse of discretion, this is not arbitrary or capricious or contrary to law to say that, well, if her family members are living in an area where they can't be harmed. But they didn't say they're living in an area. You're correct, yes. I'm curious about the standard. So the other serious harm, is it required to be on account of being a member of a protected group or not? It's just untethered. Any other serious harm, and I think there's courts that have said lack of medical care. So if you establish past persecution and then you show I have a serious illness and can't get medical care, there's decisions wide ranging for the other serious harm. But she does have to show some reasonable possibility of other serious harm. And, again, with an abuse of discretion standard, we have to look at that as well. In this case, didn't her sister flee to the U.S. after she started getting threatening phone calls? That's in the record, yes. I don't think the board considered that. But I think there was testimony that she never applied for asylum or anything like that, if that factors into it at all. Her mother's house was ransacked at one point, was it not? Yes, she did testify that her mother's house was ransacked and that her brother was shot at in his taxi. But, again, as you pointed out, she's not going to go drive a taxi. And the only indication in the record is that she's going to go, and I know, Judge Reinhart, you don't agree because the board didn't consider this, but the only evidence in the record is she's going to go live in Tijuana where she can visit with her family close by. I don't make the rules, but you know the rule is that the board didn't rely on it. That is absolutely correct. But I would ask the court, reviewing for an abuse of discretion, to find that this decision is not arbitrary, capricious, or contrary to law. And then if you'd like, for just a minute, I can talk about the cancellation of removal, I think the court's decision in Mendez-Garcia. But, you know, what I'm more concerned about is, I mean, I understand this issue. Is there a 10% chance that she'll suffer serious harm of some sort? The thing I'm not at all clear on is her real status with having now gotten approval of the petition. Do you think that has any effect on the case? Is there any possibility that it could be worked out with the government with that approval of the petition? There might be some possibility of a resolution. I would consider participating in mediation if the court wants to steer it that way again. I would just note that it went through mediation in 2012. But before she had any approval of it? That is, to my knowledge, I believe there was no approved visa petition back then. So, again, now she has this visa petition. There's still a couple of obstacles. For an outright application for adjustment, she would need waivers for the misrepresentation and also for the previous unlawful presence. The misrepresentation was what, using her sister's driver's license? I think she tried to use two different cards. I think she got stopped using her sister's driver's license, and they let her withdraw her application for admission, and she went back and bought a fake ID in Tijuana and then tried again. And that time they said, no, we're going to go ahead and detain you. May I ask you another question? If it did go back to mediation, would you be the one that would be handling it? Yes, as the last attorney on the case, I would be handling the mediation. All right, well, I feel a lot better about that. Well, thank you, Judge Reinhart. I think that's a compliment. If there are no further questions, we would ask the court to deny the petition for review. And if you do want to send it back to mediation, I will participate in that. Thank you very much. Thank you. Thank you. Just in conclusion, I want to revert back to the Board of Immigration Appeals decision where it stated the harm to the respondent suffered growing up. She has not presented evidence demonstrating severe or atrocious persecution such that a grant of humanitarian asylum is warranted. And I would submit to the court if sexual abuse of a six-year-old is not atrocious, I don't know what would be. So I believe that the atrocious harm has been suffered in this case, and this court should remand the case for consideration of the other harm that she may suffer. Her family owns an apartment complex. They own a couple of houses. Her mother didn't drive a taxi when her house was ransacked either. But these groups, these nefarious groups that the government is unable and unwilling to control are continuing to target this poor woman's family. And if she goes back, she will also be targeted. And I would also submit that the Board of Immigration Appeals failed to consider the Ninth Circuit's 1996 decision, Lopez-Galarza v. INS, where the petitioner was subjected to extreme physical abuse, including repeated rape. And that was a case where there was a finding of atrocious harm for the purposes of humanitarian asylum. I believe that similar facts apply here. I'd also submit to the court that the Board of Immigration Appeals failed to consider Hernandez-Ortiz v. Gonzalez, the Ninth Circuit's 2007 case, holding that the agency must look at the event from the child's perspective and measure the degree of injury by impact on children of that age. And then lastly, I would submit to the court that this case be remanded for the consideration of matter of LEA and also matter of ARCG, both cases that I think are important on these issues. If you have any questions, I'd be happy to try to respond to them. Thank you, Carol. Thank you.
judges: Gilman, Reinhardt, Wardlaw